**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA
MARTINSBURG**

**ORGILL, INC.,**

        Plaintiff,

**v.**                                **CIVIL ACTION NO.: 3:16-CV-158
(GROH)**

**DISTRIBUTION CENTERS OF AMERICA
(WV), LLC,**

        Defendant.

<u>**MEMORANDUM OPINION AND ORDER
GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**</u>

Currently pending before the Court is the Plaintiff's Motion for Summary Judgment [ECF No. 154], the Defendant's Motion for Summary Judgment [ECF No. 162], and both parties' responses and replies to the respective motions. ECF No. 196, 194, 231 and 230. For the reasons stated herein, the Plaintiff's motion for summary judgment [ECF No. 154] is **GRANTED** on all issues.

## I. Background

The Plaintiff in this case, Orgill, Inc. ("Orgill"), is a company engaged in the wholesale distribution of hardware home improvement products. ECF No. 154-2 at 14. In 1999, Orgill built a distribution center on real property located at 4925 Tabler Station Road, in Inwood, West Virginia ("Inwood Facility"). ECF No 162-5 at 1-2. Orgill subsequently sold that property in a "sale-leaseback" transaction to a California based entity, Sierra Crest Equities, LLC. ECF No. 154-2 at 28. Between 2004 and 2005, the Defendant, Distribution Centers of America ("DW"), began looking for financing to

purchase the Inwood Facility. ECF No. 162-5 at 3. Ultimately, DW obtained a mortgage loan through Eurohypo Bank ("Eurohypo Loan"), and on April 21, 2005, DW acquired the Inwood Facility. Id. Pursuant to the sale and the lender's requirements, DW entered into an Amended and Restated Lease Agreement ("Amended Lease") with Orgill. Id. The lease is dated April 15, 2005. Id. DW became the landlord under the new lease. Id.

The parties operated under this lease without issue until May 2015, at which time, Orgill's base rent declined from $195,341 to $178,898 per month, and DW began collecting "management fees," as "Additional Rent" under the lease agreement. ECF No. 154-2 at 119. Orgill agreed to make the additional rent payments for the remainder of the year, in return for an amendment to the lease specifying the nature and extent of permissible "additional rent" charges going forward. ECF No. 154-4 at 133-36. However, in April 2016, DW renewed its demands for additional rent dating back to 2014 and continuing forward. Id. At that point, Orgill declined to pay and instituted the action before the Court seeking declaratory relief. Id. In its answer, DW alleged several counterclaims against Orgill for breach of contract. ECF No. 11 at 11.

## II. Standard of Review

Summary judgment as to a given subject is appropriate under Federal Rule of Civil Procedure 56 when there is no genuine issue as to any material fact and the moving party is thus entitled to judgment in its favor as a matter of law. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). A genuine issue of fact exists "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). Therefore, the Court must conduct "the threshold

inquiry of determining whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." Id. at 250.

The party opposing summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). That is, once the movant has met its burden to show an absence of disputed material facts, the party opposing summary judgment must then come forward with affidavits or other evidence demonstrating there is a genuine issue for trial. Fed. R. Civ. P. 56(c); Celotex, 477 U.S. at 323-35; Anderson, 477 U.S. at 248. "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." Anderson, 477 U.S. at 249 (citations omitted).

### III. Applicable Law

The Amended Lease contains a choice of law provision specifying that any disputes arising under the lease will be governed by West Virginia law. ECF No. 162-2 at 50. Under West Virginia law, a court must determine whether a contract is ambiguous before it attempts to interpret it. Whether a contract is ambiguous is a legal determination well suited for summary judgment. Payne v. Weston, 466 S.E.2d 161, 166 (W. Va. 1995). A contract is ambiguous if it is "reasonably susceptible to two different meanings" or if "reasonable minds might be uncertain or disagree as to its meaning." Id. (citing syl. Pt. 1, in part, Shamblin v. Nationwide Mut. Ins. Co., 332 S.E.2d 639 (W. Va. 1985)). Contract language may also be considered ambiguous if "the agreement's terms are inconsistent on their face or where the phraseology can support reasonable differences

of opinion as to the meanings of words employed and obligations undertaken." <u>In re Joseph G.</u>, 589 S.E.2d 507, 512 (W. Va. 2003).

Looking at all parts of the document together, if the court finds that the contract terms are clear and unambiguous, the contract is "not subject to judicial construction or interpretation," and "the Court will apply, not interpret, the plain and ordinary meaning." <u>Payne</u>, 466 S.E.2d at 166 (W. Va. 1995). However, if the court determines that the contract "cannot be given a certain and definite legal meaning" and "is therefore ambiguous," a question of fact may be submitted to the jury as to the meaning of the contract. <u>Id.</u> Specifically, a jury may be called upon to determine the intent of the parties through extrinsic evidence. <u>Id.</u> However, if the extrinsic evidence is not in dispute, "the duty remains with the court to construe the writing." <u>Stewart v. Blackwood Electric Steel Corporation</u>, 130 S.E. 447, 449 (W. Va. 1925); <u>see also</u> <u>Lee Enterprises, Inc. v. Twentieth Century-Fox Film Corp</u>., 303 S.E.2d 702 (W. Va. 1983).

Assuming the extrinsic evidence is not in dispute, the court may interpret the contract using extrinsic evidence to show "the situation of the parties, the surrounding circumstances when the writing was made, and the practical construction given to the contract by the parties themselves either contemporaneously or subsequently." <u>Lee Enterprises, Inc.</u>, 303 S.E.2d at 705 (internal citations omitted). The court may also use proof of usage or custom to interpret any ambiguity in the contract. <u>Cotiga Development Co. v. United Fuel Gas Co.</u>, 128 S.E.2d 626, 635 (W. Va. 1962) (internal citations omitted). Ultimately, the resolution will typically turn on the parties' intent at the time of contracting. <u>Fraternal Order of Police, Lodge No. 69 v. City of Fairmont</u>, 468 S.E.2d 712,

716 n.7 (W. Va. 1996).

## IV. Discussion

There are four claims raised in the parties' summary judgment motions. ECF No. 154 and 162. These include whether Orgill is liable to DW, under the terms of the lease, for: (1) additional rent in the form of direct and indirect property management fees ("Additional Rent"); (2) litigation expenses related to a lawsuit filed in California ("Novakovic Litigation"); (3) necessary repairs to the leased property ("Maintenance and Repairs"); and (4) failure to give notice of alterations to the leased property ("Alterations and Improvements"). Each claim will be discussed in turn.

### A. Additional Rent

#### 1. Background Information

First, the parties dispute whether Orgill is liable to DW for direct and indirect management fees arising under the "Additional Rent," provision of the Amended Lease. Specifically, DW seeks to pass on to Orgill certain management fees that it incurs pursuant to its obligations under its loan. Under the Eurohypo Loan, DW was required to enter into a management agreement with respect to the Inwood Facility. ECF No. 160-3 at 39. In accordance with that obligation, DW entered into a management agreement with DCA Management Company, LLC ("DCA"). In 2006, DCA changed its name to Center Investors Group ("CIG"). ECF No. 154-2 at 102. DW paid DCA and CIG a management fee of 0.5% of "Gross Monthly Receipts derived from the operation of the Property," and additional fees if certain metrics were met. ECF No. 162-4 at 1. DW did not pass these fees through to Orgill, stating in this litigation that, "it just wasn't worth it."

ECF No. 154-2 at 119-20.

In 2014, DW refinanced its loan with UBS Real Estate Securities, Inc. ("UBS Loan"). ECF No. 162-8. Pursuant to the UBS loan, DW engaged a separate management company, Center Real Estate Management, LLC ("CR"). ECF No. 162-9 at 5. Under that agreement, DW pays CR a fee equal to 3% of the gross revenue of the Inwood Facility to directly manage the Inwood Facility ("direct management fees"). Id. DW has attempted to pass on these "direct management fees" from CR since May of 2015.

DW has also engaged the services of The Center Companies, LLC ("CE") to provide services for DW including bookkeeping, financial reports, cash flow management, and monitoring of insurance claims and requirements. ECF No. 162-5 at 4. Because CE performs services for other DW affiliates, CE's direct and overhead costs are shared between all DW affiliates. 162-12 at 23. Since DW generates approximately 92.5% of all revenue generated among the affiliates, CE allocates 92.5% of its overhead costs to DW ("indirect management fees"). DW seeks to pass through these "indirect management fees" to Orgill.

Orgill argues that the Additional Rent provision does not permit DW to charge these management fees. Specifically, Orgill argues that the Additional Rent provision is ambiguous, but that extrinsic evidence shows management fees are not contemplated under the provision. DW argues that the provision is "clear and unambiguous" and accordingly, the Court should give full effect to the plain meaning intended. However, if the Court finds that the "Additional Rent" provision is ambiguous, DW argues in the

alternative that management fees are still recoverable.

### 2. Analysis

Pursuant to the well-established principles of contract law, the Court must first determine whether the contract provision at issue is ambiguous. While DW urges the Court to find that the contract is not ambiguous, looking at the document as a whole, it is unclear whether the parties intended that "Additional Rent" include management fees.

In the recitals section of the Amended Lease, "Additional Rent" is defined as "all sums required to be paid by [Orgill] to [DW] hereunder other than Basic Rent." ECF No. 162-2 at 5. This is unhelpful in determining whether additional rent includes management fees, because it does not explain "all sums required to be paid."

Section 2.2 of the Amended Lease states that additional rent consists of "all impositions, taxes, payments or fees in lieu of taxes, insurance premiums, operating charges, costs and expenses which arise or may be contemplated under any provisions of this Lease." Id. at 15. Again, this provision is not instructive because it does not explicitly reference management fees, and it is unclear that management fees would fall into one of the plainly stated categories. Moreover, the same section provides examples of additional rent including "insurance premiums," "expenses of occupying, operating, altering, maintaining and repairing the Leased Premises," and "all taxes, assessments, fees in lieu of taxes and other governmental charges." Id. These examples do not suggest that management fees were contemplated as a form of additional rent.

Section 2.4. states that the lease is a "'net-net-net lease,' it being understood that the Landlord shall receive the Basic Rent, Additional Rent and all other sum payable to it

pursuant to the terms of this Lease, free and clear of any and all impositions, taxes, liens, charges or expenses of any nature whatsoever in connection with the Landlord's ownership and leasing of the Leased Premises." Id. at 17. The same section states, "Unless caused by the actions of the Landlord, all costs, expenses, and obligations of every kind and nature whatsoever relating to the Leased Premises and the appurtenances thereto . . . shall be paid by the Tenant." Id.

DW uses these provisions to argue that Orgill is responsible for all costs related to the Inwood Facility and that it would not receive its rent "free and clear" unless Orgill pays the management fees. Orgill argues that the term "net-net-net lease," is itself ambiguous. While not clearly defined under West Virginia law, at least one case suggests that a triple net lease "places the responsibility of taxes, liability insurance, and maintenance on the lessee in exchange for lower rent." Camastro v. Diesk, 484 S.E.2d 188 (W. Va. 1997). Notably, this definition leaves out any reference to management fees.

Orgill emphasizes that the qualifier "unless caused by the Landlord" applies to the management fees at issue, because DW alone made the decision to refinance its existing loan and enter into the management agreement at issue. In opposition, DW argues that the qualifier only applies to the physical property, and not DW's "ownership and leasing" of the property. By such argument, the management fees would not be excluded. However, a separate provision under Section 3.3, "Maintenance and Repair," provides for the physical property and states that "Landlord shall be responsible for all damages (and repairs necessitated thereby) caused by the Landlord." Id. at 21. Accordingly, the

phrases would be duplicative if Section 2.4 was construed to apply only to the leased property.

In either event, the qualifier "unless caused by the actions of the Landlord," makes it clear that at least some costs cannot be passed on to Orgill. Whether the management fees are one of these costs is unclear from the plain language. Moreover, DW's inability to pass through some costs is inconsistent with the provision that DW receives rent free and clear of any charges or expenses of any nature.

Accordingly, it is not apparent by a plain reading of the Amended Lease whether "Additional Rent" includes any management fees. Thus, the Court must evaluate the extrinsic evidence to interpret the contract. If the extrinsic evidence is disputed, interpretation becomes a question of fact for the jury. In this case, the material extrinsic evidence is not in dispute. Therefore, interpretation remains a question of law for the Court.

To determine the parties' intent at the time of contracting, the Court evaluated the situation of the parties, the surrounding circumstances when the writing was made, the practical construction given to the contract by the parties themselves either contemporaneously or subsequently, and any evidence of custom or usage that was in the contemplation of the parties at the time of contracting. In this case, the Court finds that the parties did not contemplate that the "Additional Rent" provision would include management fees.

First, the Amended Lease was drafted through a series of negotiations and draft exchanges between Orgill and DW. ECF No. 154-1 at 3. Although thoroughly

discussing Orgill's obligations under the contract, the lease does <u>not</u> directly address management fees. Even where the lease provides examples of additional rent, it does not identify management fees, or even suggest that management fees would be included.

Additionally, counsel for Orgill specifically requested that the lease include the provision "unless caused by the actions of the Landlord" because "[h]e wanted to make sure that it was unambiguous . . . that the landlord could not go out and just spend money on certain activities that they thought were appropriate and just bill them to [Orgill]." ECF No. 204-1 at 3. This deliberate addition suggests that, at the very least, Orgill did not intend to be charged these sorts of management fees. While DW argues that the qualifier does not apply to management fees, the qualifier is very broad. The provision states, "[u]nless caused by the actions of the Landlord, all costs, expenses and obligations *of every kind and nature whatsoever relating to the Leased Premises* . . . shall be paid by the tenant." ECF No. 162-2 at 17 (emphasis added). The statement "unless caused by the actions of the landlord" qualifies "costs, expenses and obligations of every kind and nature whatsoever relating to the Leased Premises." Accordingly, the Court finds that the parties intended that <u>any</u> cost or expense caused by the Landlord should be paid by the Landlord. Moreover, Orgill's counsel included similar limiting language in lease agreements in Utah, Missouri, and Texas, and no landlord at those facilities has collected management fees as additional rent. ECF No. 204-3 at 12-13.

Moreover, in an appraisal report of the Inwood Facility commissioned by one of DW's lenders, the appraiser remarked that the "[l]ease terms are triple net" and that "the tenant is responsible for paying real estate taxes, insurance, utilities, and all maintenance

related expenses." ECF No. 204-10 at 4. The same appraiser said, "[t]he tenant pays all expenses directly," and, importantly, "[m]anagement fees may be incurred by the landlord and are not passed-through." Id. Defining a "net lease," the report states, "In a triple net lease, all operating expenses are the responsibility of the tenant . . . [h]owever, management fees . . . are often the responsibility of the lessor." Accordingly, it appears contrary to trade custom to pass through management fees in these types of leases.

Considering the practical construction given to the contract, from 2005 to 2015, DW did not attempt to collect management fees from Orgill, despite paying management fees equivalent to 0.5% of "Gross Monthly Receipts derived from the operation of the Property." ECF No 162 at 2-3. It was only when the management fee increased by 2.5% that DW sought to collect it. While the Court recognizes that the Amended Lease has a "no waiver" provision, the fact that DW paid these fees for ten years without attempting to collect them is some evidence that management fees were not contemplated as part of additional rent.

Based on the aforementioned extrinsic evidence, the Court finds that the parties did not intend for management fees to be passed through to Orgill under the "Additional Rent" provision. Moreover, there is certainly an argument that the management fees are "caused by the Landlord," in as much as DW alone entered into a loan agreement which obligated it to obtain management services. DW alone chose to refinance in 2014, and DW alone agreed to the terms in the refinance—which included a management fee equivalent to 3% of the gross revenue of the Inwood Facility. Orgill was not included in that agreement and did not negotiate the terms thereof. This premise is supported by at

least one court which held that, in a lease that does not explicitly address responsibility for management fees, management fees cannot be passed on to the tenant because "hiring a management company . . . [is] for [the Landlord's] own benefit and convenience." Viking Bank v. Firgrove Commons 3, LLC, 334 P.3d 116, 120-22 (Wash. Ct. App. 2014).

### 3. Conclusion

Accordingly, the Court **FINDS** that the Defendant is <u>not</u> entitled to pass through direct or indirect management fees to the Plaintiff under the "Additional Rent" provision of the Amended Lease. Thus, the Court hereby **ORDERS** that summary judgment for the Plaintiff is **GRANTED** in so far as it pertains to direct and indirect management fees.

## B. Novakovic Litigation Expenses

### 1. Background Information

Next, the parties dispute whether Orgill is liable to DW for litigation expenses incurred in a civil suit originating in California. ECF No. 154 at 1. DW seeks reimbursement for defense costs and a settlement payment made in connection with litigation for an automobile accident which occurred in 2011. ECF No. 160 at 18. Specifically, on October 12, 2011, Marcus Silva was involved in an automobile accident in Orange County, California. ECF No. 154-4 at 15. The vehicle Mr. Silva was driving was co-titled in the name of Mr. Silva and Mr. Myer, the general manager for DW. ECF No. 154-1 at 17. Ultimately, the injured party filed suit against Mr. Silva, Mr. Myer and others in October 2012. <u>Id.</u> In October 2013, DW was named as a Defendant in the litigation. <u>Id.</u> The Court ultimately dismissed DW, but only after DW incurred $116,034.34 in attorney fees and expenses, and paid $25,000 to settle and obtain a

release as to potential cross-claims.  ECF No. 162-17 at 9-11.

DW argues that, had Orgill provided insurance as required under the terms of the Amended Lease, DW would have been covered for those expenses.  ECF No. 162 at 8. Specifically, DW argues that, under the terms of the Amended Lease, Orgill should have provided named insured automobile liability insurance coverage to DW.  Orgill contends that it was not obligated to provide named insured coverage and, as such, the claim for litigation related expenses should be denied.

The pertinent provision of the Amended Lease states, "Tenant shall maintain at its sole cost and expense the following insurance on the Leased Premises: . . . (d) Any other insurance coverage . . . that may from time to time be reasonably required by Landlord or by Lender in order to protect their respective interests."  ECF No. 162-2 at 23-24.  It is undisputed that the Eurohypo Loan required named automobile liability insurance for DW.  The loan states, "[DW] shall obtain and maintain, or cause to be maintained, insurance for [DW] and the Property providing at least the following coverages: . . . motor vehicle liability coverage for all owned and non-owned vehicles, including rented and leased vehicles containing minimum limits per occurrence of One Million and No/100 Dollars ($1,000,000.00).  ECF No. 162-3 at 29-31.  The Eurohypo Loan further states that "[a]ll policies of insurance . . . shall name Borrower as the insured and Lender and its successors and/or assigns as additional insured."  ECF No. 162-3 at 32.

Accordingly, the issue ultimately turns on whether the Amended Lease requires Orgill to provide named insured automobile liability insurance coverage to DW pursuant to the Eurohypo Loan.

### 2. Analysis

As with other contract disputes, the Court's first inquiry is whether the lease terms are ambiguous. If the terms are unambiguous, the Court does not interpret the contract, but rather applies its plain meaning.

In this case, the Court finds that the terms of the lease are unambiguous. The Amended Lease requires Orgill to provide insurance "that may from time to time be reasonably required by the Landlord or the Lender." However, this statement is qualified by the introductory phrase which states, "Tenant shall maintain . . . the following insurance on *the Leased Premises*." ECF No. 162-2 at 23 (emphasis added). Accordingly, Orgill is only required to provide insurance "reasonably required by the Lender" if that insurance pertains to "the Leased Premises." Thus, Orgill had no duty to provide automobile coverage to DW.

Moreover, even if the lease is interpreted to mean that Orgill must provide *any* insurance required by the Landlord or Lender, the Eurohypo Loan does not explicitly require that Orgill provide named automobile insurance to DW. Rather, it states that DW "shall obtain and maintain, or cause to be maintained," named automobile insurance. ECF No. 162-3 at 29. By these terms, DW is required to provide its own automobile insurance, *or* it could require Orgill to insure it. Thus, it cannot be said that the Lender required Orgill to provide named automobile insurance coverage for DW. While DW could have required such coverage, without some separate contractual agreement between DW and Orgill, the Eurohypo loan by itself does not obligate Orgill to provide the insurance on DW's behalf.

14

### 3. Conclusion

Accordingly, the Court **FINDS** that the Plaintiff is not required to provide named automobile insurance for the Defendant, and so, the Plaintiff is not liable to the Defendant for Novakovic-related litigation expenses. Thus, the Court hereby **ORDERS** that summary judgment for the Plaintiff is **GRANTED** in so far as it pertains to Novakovic-related litigation expenses.

### C. Maintenance and Repairs

#### 1. Background Information

Next, the parties dispute whether Orgill is liable to DW for failure to make necessary repairs under the Amended Lease. DW states that Orgill failed to repair and maintain its water tank, the lower parking lot, metal halide lights, and fire sprinklers. ECF No. 160 at 10-16. Orgill denies that it has not upheld its obligations under the lease. ECF No. 155 at 18. Orgill further argues that, assuming Orgill failed to maintain the property, DW did not provide the requisite notice. Id. at 22-23. DW argues that it provided notice by filing cross claims approximately a year ago and that it was prevented from providing earlier notice by Orgill's conduct. ECF No. 196 at 24.

#### 2. Analysis

First, DW argues that Orgill failed to make necessary repairs and properly maintain the Inwood Facility. The applicable provision of the Amended Lease states that, "Tenant shall at all times . . . keep and maintain the Leased Premises . . . in good repair and appearance, and shall promptly make all repairs and replacements . . . of every kind and nature, whether foreseen or unforeseen, which may be required to . . . keep and maintain

the Leased Premises in as good repair and appearance as they were as of the Commencement Date, except for ordinary wear and tear." ECF No. 162-2 at 20. There is conflicting evidence as to whether Orgill upheld its obligations under this provision. Accordingly, the Court will not decide whether Orgill breached its obligations to maintain and repair the facility.

However, Orgill argues that even if it failed to properly maintain the facility, DW failed to provide the requisite notice and opportunity to cure. ECF No. 155 at 23. Accordingly, Orgill states that it has not breached the lease because it was not given the opportunity to cure any defects. DW argues that it provided notice of the defects through this litigation and its cross claims filed approximately one year ago. ECF No. 196 at 24. The applicable lease provision governing this dispute states that, "[i]f Tenant shall be in default under any of the [Maintenance and Repair] provisions, Landlord or Lender may, after thirty (30) days' notice to Tenant and failure of Tenant to commence to cure during said period or to diligently prosecute such cure to completion once begun . . . do whatever is necessary to cure such default as may be reasonable under the circumstances for the account of and at the expense of Tenant." ECF No. 162-2 at 21.

Applying the plain meaning of the contract, DW is required to notify Orgill of any defect under the Maintenance and Repair provision, and then allow thirty days for Orgill to begin curing that defect, before Orgill is considered to have breached the Amended Lease. In this case, DW argues that it provided notice when it brought its cross claims approximately one year ago. However, this does not provide Orgill with an opportunity to cure the defect. In fact, DW acknowledges that, "[t]he fact remains unchanged that

16

Orgill failed to properly maintain the water tank until its Lease violations were uncovered in this litigation, meaning DW incurred legal fees and costs to enforce the provisions of the Lease . . . entitling it to recover attorney fees." ECF No. 230 at 14. However, DW may not have incurred attorney fees if it had given Orgill an opportunity to cure any defects outside of this litigation. Moreover, DW acknowledges in its reply that the issues identified in DW's motion for summary judgment have been cured, or are in the process of being cured. ECF No. 230 at 13-14. Thus, even assuming this litigation provided sufficient notice, Orgill has cured any defects identified. Accordingly, Orgill cannot be liable for damages under the lease provision.

However, DW further argues that it was prevented from giving notice of default by Orgill's conduct. ECF No. 196 at 24. Specifically, DW argues that Orgill refused to provide repair information upon request and failed to keep track of repairs. Id. However, there is no lease provision which requires the tenant to provide repair information or to keep track of repairs for the landlord's benefit. There is a lease provision which states, "Landlord may enter upon and examine any of the Leased Premises at reasonable times after reasonable notice and during business hours without notice and exercise any rights and privileges granted to Landlord under the provisions of this Lease." ECF No. 162-2 at 19. Accordingly, pursuant to this provision, DW was entitled to enter and inspect the Inwood Facility to determine if there were any maintenance or repair issues. It chose not to do so. Accordingly, this argument must fail.

### 3. Conclusion

Therefore, the Court **FINDS** that Orgill has not breached the "Maintenance and Repair" provision of the Amended Lease. Thus, the Court hereby **ORDERS** that summary judgment for the Plaintiff is **GRANTED** in so far as it pertains to "Maintenance and Repairs."

### D. Failure to Provide Notice of Alterations

### 1. Background Information

Finally, the parties dispute whether Orgill failed to provide notice of alterations as required by Section 3.4 of the Amended Lease. The applicable provisions state:

> Prior to making any Alterations, improvements or expansion to the Leased Premises which: (A) do not affect the outside or façade of the building or do not involve removal of any part of any floor, load-bearing wall, column, girder, or other support, or do not affect roof load and (B) involve a cost which Tenant reasonably and in good faith estimates to be less than One Hundred Thousand Dollars ($100,000), Tenant shall furnish to Landlord information (including sketches and drawings which may be prepared by officers or employees of Tenant) as to the proposed changes in walls and partitions or relocations thereof and Plans and Specifications, if available, covering any proposed work, but Tenant may proceed forthwith to make such specified alterations;

and,

> Prior to making any Alterations, improvements or expansion to the Leased Premises which: (A) affect the outside or façade of the building or involve removal of any part of any floor, load-bearing wall, column, girder, or other support, or affect roof load or (B) involve a cost which Tenant reasonably and in good faith estimates to be One Hundred Thousand Dollars ($100,000) or more, Tenant shall furnish to Landlord Plans and Specifications or other detailed information covering the proposed work, and Tenant shall not commence such work unless within thirty (30) business days thereafter, Landlord shall either approve or shall not advise Tenant of Landlord's disapproval of such Plans and Specifications, which approval Landlord will not unreasonably withhold.

ECF No. 162-2 at 22.

DW argues that Orgill: (1) replaced halide lights; (2) rebuilt a wire yard with concrete replacing asphalt; (3) installed high speed doors; (4) repaired sink holes; and (5) installed fans in violation of the aforementioned lease provisions. ECF No. 162 at 6-7. DW states that the wire yard and lights exceeded the $100,000 limit, requiring "plans and specifications" and approval by DW. Id. DW further avers that Orgill installed high speed doors, repaired sink holes, and installed fans—for less than $100,000—without notifying DW as required by the Amended Lease. Id. Orgill argues that the alterations costing less than $100,000 did not affect the walls or partitions, and accordingly, required no notice. ECF No. 204 at 25. Orgill further argues that only the wire yard exceeded $100,000, and that DW had notice of that project and did not object. Id.

### 2. Analysis

First, the Court will evaluate whether Orgill's failure to give notice of the projects costing less than $100,000 violated the terms of the Amended Lease. As agreed upon by both parties, these projects include: (1) installing high speed doors; (2) repairing sink holes; and (3) installing fans. Applying the plain, unambiguous language, Orgill was required to provide "information (including sketches and drawings which may be prepared by officers or employees of Tenant) as to the proposed changes in walls and partitions or relocations thereof and Plans and Specifications, if available." ECF No. 162-2 at 22. In this case, none of the projects changed or relocated any walls or partitions. Accordingly, this provision does not apply to the installation of high speed doors, repairs to sink holes, or installment of fans because there were no plans or specifications regarding changes to walls or partitions to provide. Thus, Orgill did not breach the terms of the Amended

Lease by failing to provide notice.

Next, DW argues that Orgill failed to provide notice of two projects which exceeded $100,000, including replacing halide lights and rebuilding the wire yard with concrete instead of asphalt. ECF No. 162 at 6-7. Orgill disputes that replacing the halide lights falls within the scope of the contract provision and states that it did provide notice of the wire yard. As to the replacement of the lights, the Court notes that the replacements occurred over a period of seven years. ECF No. 162-14 at 7. While the total cost adds up to approximately $110,000, no single charge cost more than $19,000, and most replacements averaged between $2,000 and $10,000. Id. It cannot be said that this was a single project, as light bulbs will necessarily need to be replaced throughout an extended lease term. Therefore, the claim that Orgill breached the lease by failing to give notice of the replacement of the lights is without merit.

As to the wire yard, Orgill states that it provided notice of the project and that DW did not object. While Orgill states that it provided notice and that DW did not object, there is no evidence before the Court that Orgill did so. There is, however, evidence that at least one Orgill employee responsible for maintenance did not inform DW of the project. ECF No. 204-18 at 4. That one employee did not inform DW of the project is not conclusive. Accordingly, it appears that there is a factual dispute as to whether Orgill informed DW and obtained approval for the wire yard. Therefore, the Court will not decide whether Orgill breached its obligation under the Amended Lease, in so far as it failed to notify DW and obtain approval before completing the wire yard.

However, assuming arguendo that Orgill breached its obligation, DW fails to allege

any damages resulting from the failure to give notice.   DW has not indicated that it would have withheld approval, or that it could have withheld approval had it chose to do so. Notably, approval may only be "reasonably" withheld.   Accordingly, there is no evidence that DW suffered any damages.   Furthermore, while DW seeks declaratory relief to "prevent reasonably certain future conduct," [ECF No. 196 at 25], DW is not entitled to declaratory relief because it has only shown a single instance over a twelve year lease where Orgill may have failed to provide requisite notice.   Therefore, future violations of the notice provision are not "reasonably certain," and declaratory relief is denied.

### 3. Conclusion

Therefore, the Court **FINDS** that Orgill did not breach the "Alterations and Improvements," provision of the Amended Lease in so far as it: (1) replaced halide lights; (2) installed high speed doors; (3) repaired sink holes; and (4) installed fans.   The Court further **FINDS** that there is a factual dispute regarding whether Orgill failed to provide notice of the wire yard replacement.   Nevertheless, DW is not entitled to damages or declaratory relief.   Thus, the Court hereby **ORDERS** that summary judgment for the Plaintiff is **GRANTED** in so far as it pertains to "Alterations and Improvements."

### V. Conclusion

Based upon the aforementioned reasons, the Plaintiff's Motion for Summary Judgment [ECF No. 154] is hereby **GRANTED**.   The Defendant's Motion for Summary Judgment [ECF No. 162] is **DENIED**.   In so far as this concludes the litigation in this matter, the remainder of the pending motions are **TERMINATED AS MOOT**.

This case is **ORDERED** stricken from the Court's active docket. The Clerk of Court

is **DIRECTED** to enter judgment in favor of the Plaintiff.   The Clerk is further **ORDERED**

to transmit copies of this Order to all counsel of record herein.

      **DATED:** November 16, 2017

GINA M. GROH
CHIEF UNITED STATES DISTRICT JUDGE